**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NEW CINGULAR WIRELESS PCS, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>CITY OF CAMBRIDGE, BOARD OF ZONING )<br>APPEAL of the CITY OF CAMBRIDGE, )<br>and CONSTANTINE ALEXANDER, TIMOTHY )<br>HUGHES, BRENDAN SULLIVAN, )<br>DOUGLAS MYERS, and SLATER )<br>ANDERSON, in their capacities as members )<br>of the CITY OF CAMBRIDGE BOARD OF )<br>ZONING APPEAL, )<br><br>Defendants. ) | Civil Action No. |

**COMPLAINT**

This action arises out of the unlawful denial of a wireless communications facility siting request by the City of Cambridge and its Board of Zoning Appeal. Plaintiff New Cingular Wireless PCS, LLC ("AT&T") for its Complaint alleges as follows:

1.     The Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.* (the "Telecommunications Act" or "Act") preempts municipal decisions that "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B). The City of Cambridge Board of Zoning Appeal (the "Board") violated Section 332(c)(7)(B) of the Act when it denied AT&T's application (the "Application") for a special permit to install wireless communications antennas and related equipment (the "Facility") on the roof of 1558 Massachusetts Avenue in Cambridge, Massachusetts (the "Site").

2.      AT&T seeks to install the Facility at the Site in order to remedy a significant and

substantial gap in its personal wireless services coverage immediately north of Harvard Square in

Cambridge (the "Coverage Area").  Before it selected the Site, AT&T considered numerous

potential locations for the proposed Facility, but each of the alternative sites proved not to be a

feasible location.  AT&T's proposal is the only feasible option for filling its significant coverage

gap in the area.  The wireless antennas would be located inside six faux-chimneys that would

substantially match existing chimneys on the roof of the Site.  All of the communications

equipment would be located in the basement of the building, and the air conditioning units would

be located out-of-sight and out-of-earshot on the roof of the building.

3.      The Board's denial of AT&T's Application prohibits or has the effect of

prohibiting AT&T's provision of personal wireless services, in violation of 47 U.S.C. §

332(c)(7)(B), and was not supported by substantial evidence contained in a written record, in

violation of 47 U.S.C. § 332(c)(7)(B)(iii).

## THE PARTIES

4.      Plaintiff New Cingular Wireless PCS, LLC (referred to herein as AT&T) is a

Delaware limited liability company with a principal place of business in Atlanta, Georgia.  It is

licensed to conduct business in the Commonwealth of Massachusetts and operates wireless

communications facilities throughout the Commonwealth.  New Cingular Wireless PCS, LLC is

an indirectly-wholly owned subsidiary of AT&T Inc., which, through its operating subsidiaries,

provides wireless communications services nationwide.

5.      The Defendant City of Cambridge ("Cambridge") is a duly constituted

municipality in Middlesex County, Massachusetts, with its principal office located at City Hall,

795 Massachusetts Avenue, Cambridge, Massachusetts 02139.

6.     The Defendant Board of Zoning Appeals of the City of Cambridge is a duly constituted board, the members of which are appointed by the City Manager of Cambridge, and has an office located at City Hall, 795 Massachusetts Avenue, Cambridge, Massachusetts 02139.

7.     The Defendants Constantine Alexander, Timothy Hughes, Brendan Sullivan, Douglas Myers, and Slater Anderson are all residents of Cambridge and members of the Board that denied AT&T's Application.  Each is named a Defendant solely in his capacity as a member of the Board.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to (a) Section 332(c)(7)(B)(v) of the Telecommunications Act because AT&T has been adversely affected and aggrieved by the Board's denial of its Application, and (b) 28 U.S.C. § 1331 because this action presents a federal question under the Telecommunications Act.  This action may also be maintained under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (the "Declaratory Judgment Act") because an actual controversy exists.

9.     Venue is proper in this Court pursuant to 28 U.S.C § 1391 because AT&T's claims arose in this judicial district.

## FACTS

### Background

10.    AT&T provides wireless voice and data products and services to customers nationwide, including "personal wireless services" within the meaning of Section 332 of the Telecommunications Act.  47 U.S.C. § 332.  AT&T's wireless coverage reaches in excess of 300 million people, while its "3G" network—which allows customers access to the Internet, e-mails, and streaming music and videos—currently reaches approximately 233 million people.  AT&T

must constantly update its technology and expand its network to keep up with customers' ever-growing demand for mobile services, including mobile data services.

11.    The licenses authorizing AT&T to provide wireless service in Cambridge were issued by the FCC pursuant to 47 U.S.C. § 151.  Section 151 establishes a national policy to "make available, so far as possible, to all people of the United States, without discrimination . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151.  To meet these policy goals, AT&T seeks to provide personal wireless services to local businesses, public safety entities, and the general public.  To advance the national policies enumerated under 47 U.S.C. § 151, AT&T must create and maintain a network of "cell sites," each of which consists of antennas and related equipment designed to send and receive radio signals.

12.    Wireless service is important to public safety and convenience.  From 1996 to 2007, the number of wireless users increased more than five fold – from 44 million to more than 255 million wireless subscribers. *See FCC's Thirteenth Report to Congress on the State of Competition in the Commercial Mobile Radio Services Marketplace,* p. 131, Table A-1 (Jan. 16, 2009).  There are now more wireless subscriptions than landline telephone subscriptions in the United States.  At present, the number of landline telephone subscribers across the nation is declining each year while the number of wireless users increases.

13.    For many Americans, wireless devices have become an indispensable replacement for traditional landline telephones.  Even when Americans maintain both types of service, they are opting increasingly to use wireless over their landline telephones.  From 1996 to 2004,

Americans more than quadrupled their time spent talking on their cell phones, while markedly reducing the number of long-distance and local calls made over conventional landlines. From 2001 to mid-2007, the number of minutes of use by wireless subscribers in the United States increased more than five fold from less than 200 billion minutes of use per year to more than a trillion minutes of use.

14.     For Americans living in "wireless-only" homes and working in wireless-only businesses, cell phones are often their only lifeline in emergencies. Between 1995 and 2006, the number of 911 calls made by people using wireless phones more than doubled, to over 50 million a year. Public safety agencies estimate that approximately 50% of the millions of 911 calls they receive daily are placed from cell phones, and the percentage is growing. *See FCC Consumer Facts, Wireless 911 (last updated on Oct. 17, 2008).*

15.     Wireless devices using all digital technology operate by transmitting a radio signal to antennas mounted on a tower, pole, building, or other structure. The antenna feeds the signal to electronic devices housed in a small equipment cabinet, or base station. The base station is connected by microwave, fiber optic cable, or ordinary telephone wire to a base station controller subsequently routing the calls throughout the world.

16.     In order to provide reliable service to a user, coverage must overlap in a grid pattern resembling a honeycomb. If AT&T is unable to construct a "cell site" within a specific geographic area, it will not be able to provide service to the consumers within that area.

17.     When considering whether there is a need to upgrade wireless service in an area, among the factors that AT&T evaluates are population density, existing and anticipated customer base, and demand for wireless services and the need to provide coverage to indoor areas. When a need for an upgrade is identified, AT&T designates a search ring around the area within which

a wireless facility at the desired height must be located or upgraded. The study takes into account the topography of the land, the coverage boundaries of neighboring cells and other factors. For low-power signals such as the wireless signals at issue here, there must be an unobstructed line of site, thereby limiting the number of adequate sites at which a wireless facility may be located.

18.    In order for the entire network to be operational, there must be properly placed cell sites installed and functioning so that reliable coverage can be realized, and only when the entire system is operational will a user have service and an uninterrupted conversation throughout a given territory. If there is no functioning cell site within a given area, there would be no service for customers within that area, and mobile customers who travel into the area will experience an unacceptable level of dropped calls.

**The Only Feasible Option for Closing AT&T's Coverage Gap**

19.    AT&T has a significant gap in its network coverage in the Coverage Area north of Harvard Square in Cambridge. The area is roughly bounded by Alewife Station to the west, Concord Avenue to the north, and Brattle Street to the south.

20.    In addition to the Site, AT&T identified and evaluated six other buildings and structures as possible sites for providing the needed coverage in the Coverage Area, but in each case either the owner of the alternative site was not interested in leasing a portion of it for a wireless facility, or the alternative site would not serve AT&T's targeted coverage area because other buildings or structures would block the signal from reaching the targeted area.

21.    Moreover, on or about January 25, 2007, the Board denied a prior application for a special permit submitted by AT&T to locate a wireless facility near the Site on Concord Avenue in Cambridge.

22.     The only feasible option for AT&T to obtain the necessary coverage in the Coverage Area is to locate the Facility at the Site.

### The Cambridge Zoning Ordinance

23.     Under the Cambridge Zoning Ordinance, wireless antennas are permitted by special permit.  Cambridge Zoning Ordinance, Art. 4.32(g)(1).  The Site at which AT&T seeks to install the Facility is in a Residence C-3 residential zoning district.  In a residential zoning district, Cambridge permits the installation and operation of wireless antennas upon a finding, *inter alia*, that nonresidential uses predominate in the vicinity of the proposed location and that the facility is not inconsistent with the character that prevails in the surrounding neighborhood. Cambridge Zoning Ordinance, Art. 4.32(g)(1), n. 49.

24.     Nonresidential uses predominate in the vicinity of the Site.  Harvard Law School is located across the street from the Site, two Methodist churches are within 250 feet of the Site, a Christian Science church abuts the Site, and Cambridge Common, a restaurant and bar, is within approximately 1,000 feet of the Site.

### AT&T's Application for a Special Permit

25.     On December 7, 2009, AT&T submitted its Application to the Cambridge City Clerk and to Constantine Alexander, the Chairperson of the Board.

26.     In its Application, AT&T explained that the proposed Facility would consist of the following:

    a.  Twelve antennas mounted within six artificial (or faux) chimneys matching the existing chimneys;

    b.  equipment cabinets in the building basement;

    c.  cable trays located on painted wood sleepers on the roof to connect the antennas and radio equipment with co-axial cables; and

7

     d.   electric and telephone utilities in the building basement, connected to the roof facilities through an internal building conduit.

27.    The Facility also requires air conditioning units that AT&T initially proposed to place out of public view in the courtyard of the building. On January 21, 2010, AT&T submitted an amendment to its Application in which it explained that it proposed to move the two air conditioning condensing units from the courtyard to the roof of the building, where they would not be visible from any public way or to the building tenants, and would also ensure compliance with the Cambridge Noise Ordinance. AT&T also proposed to move GPS antennas from the southwest façade of the building to the roof, where they would be less visible.

28.    AT&T demonstrated in its Application (and attached exhibits) that the Facility would address the significant and substantial coverage gap existing in the Coverage Area.

29.    In the Radio Frequency Report attached to its Application, AT&T explained that it had evaluated various possible alternative sites for the Facility in the Coverage Area, but that none of them were feasible either because of the inability to lease a site, or because other buildings would block the wireless signal from reaching the entire Coverage Area.

**The Board's Hearing and Decision**

30.    On June 24, 2010, the Board held a hearing on AT&T's Application. At the hearing, AT&T presented uncontroverted evidence, including the Radio Frequency Report, demonstrating that it has significant gaps in coverage in the Coverage Area that would be addressed through the proposed Facility. AT&T also introduced uncontroverted evidence concerning its search for appropriate alternative sites within the Coverage Area and that no alternative sites were feasible. With regard to the aesthetics of the proposed Facility, AT&T presented a sample of the fiberglass brick that would cover the exterior of the artificial chimneys,

and also introduced a letter from the Cambridge Planning Board supporting the faux chimney plan for the Facility.

31.     After the Chairperson of the Board moved to approve AT&T's Application with various conditions, including that the installation of the Facility proceed in accordance with the plans presented by AT&T and that efforts be taken to minimize the visual impact of the faux chimneys, the Board voted on AT&T's Application.

32.     The Board's vote, three members in favor to two members against, resulted in an effective denial of AT&T's Application because four affirmative votes are required to grant a special permit pursuant to the Ordinance and Massachusetts state law.

33.     Without specifying any particular reason for the denial, the Board's decision states generally that the denial was based on "the information presented, the failure of the…motion, and upon the absence of one or more of the following:

1.  The meeting of the requirements of [the Cambridge Zoning Ordinance];

2.  Traffic generated or patterns of access or egress would not cause congestion, hazard, or substantial change in the established neighborhood character;

3.  The continued operation of or the development of adjacent uses as permitted in the Ordinance would not be adversely affected by the nature of the proposed uses;

4.  Nuisance or hazard would not be created to the detriment of the health, safety and/or welfare of the occupants of the proposed use;

5.  The proposed use would not impair the integrity of the district or adjoining district or otherwise derogate from the Ordinance, and in fact would be a significant improvement to the structure and benefit of the neighborhood, and;

6.  The new use or building construction is not inconsistent with the Urban Design Objectives set forth in Section 19.30 of the Cambridge Zoning Ordinance."

A copy of the Decision is attached hereto as Exhibit 1.

34.     The evidence and record before the Board provided no support for the Board's purported findings and conclusions, in contravention of the Telecommunications Act.  In further

contravention of the Act, the Board's decision fails to set forth the reason or reasons for the

denial with sufficient specificity to permit a reviewing Court to meaningfully evaluate it.

35.     The Act contains a crystal clear declaration of Congressional intent regarding

telecommunications:

> ...to provide for a pro-competitive, de-regulatory national policy framework designed to
> accelerate rapidly private sector deployment of advanced telecommunications and
> information technologies and services ... by opening all telecommunications markets to
> competition ....

H.R. Conf. Rep. No. 104-458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124; see also

Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 493 (2d Cir. 1999) (citing conference

report).  In furtherance of this goal, Congress enacted 47 U.S.C. § 332(c)(7), which imposes

limits on state or local governmental decisions regarding the location, construction and

modification of personal wireless facilities, see 47 U.S.C. § 332(c)(7)(B)(i) and 47 U.S.C. §§

332(c)(7)(B)(ii)-(iv).

36.     Although the Act preserves traditional local zoning authority over the siting of

wireless facilities, 47 U.S.C. § 332(c)(7)(A), "the method by which siting decisions are made is

now subject to judicial oversight.  Therefore, denials subject to the Act are reviewed by [a] court

more closely" than are other types of zoning decisions to which federal courts generally accord

great deference.  Cellular Tel. Co., 166 F.3d at 493 (internal citation omitted).

37.     The Act contains five enumerated limitations to State and local zoning authority.

See 47 U.S.C. § 332(c)(7).  Among other things, "[i]f a [municipal] decision is not supported by

substantial evidence, § 332(c)(7)(B)(iii), or if it effectively prohibits the provision of wireless

service, § 332(c)(7)(B)(i)(II), then under the Supremacy Clause of the Constitution, local law is

pre-empted in order to effectuate the Act's national policy goals." <u>Second Generation Props. L.P.</u>

<u>v. Town of Pelham</u>, 313 F.3d 620, 627 (1st Cir. 2002).

**COUNT I**

**(The Federal Telecommunications Act of 1996,
47 U.S.C. § 332(c)(7)—Effective Prohibition)**

38.    AT&T incorporates here by reference the allegations in each of the paragraphs

above.

39.    The Telecommunications Act is designed "to promote competition and reduce

regulation in order to secure lower prices and higher quality services for American

telecommunications consumers and encourage the rapid deployment of new telecommunications

technologies." <u>T-Mobile USA, Inc. v. City of Anacortes</u>, 572 F.3d 987, 991 (9th Cir. 2009).

Broadband data service, both wireless and wireline, is one of the "new telecommunications

technologies" at the forefront of the Federal Communications Commission's ("FCC") agenda.

According to the FCC, "[o]ur goal must be for every American citizen and every American

business to have access to broadband services," and "we have not yet met the challenge of

bringing broadband to everyone." <u>In the matter of a National Broadband Plan for Our Future</u>, 24

F.C.C.R. 4342, ¶ 5 (April 8, 2009).

40.    Local authority over zoning and land use matters cannot be used to "prohibit or

have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. §

332(c)(7)(B)(i)(II).

41.    The Telecommunications Act requires local zoning authorities to allow carriers to

fill significant gaps in their wireless networks.

42.    AT&T has a significant and substantial gap in its wireless network and provision

of personal wireless services in Cambridge.

11

43.     AT&T's proposed Facility at the Site is the only feasible and least intrusive means of remedying AT&T's significant gap in its personal wireless service coverage.

44.     The Board's decision violates Section 332(c)(7)(B)(i)(II) because the denial of AT&T's Application has the effect of prohibiting the provision of personal wireless service.

45.     The Board's decision has caused and will continue to cause AT&T irreparable harm.

46.     AT&T is entitled to relief under the Telecommunications Act ordering the Board to issue the special permit sought by AT&T in its Application, and all other permits and approvals required to install, operate and maintain the Facility.

**COUNT II**

**(The Federal Telecommunications Act of 1996,
47 U.S.C. § 332(c)(7)—Substantial Evidence)**

47.     AT&T incorporates here by reference the allegations in each of the paragraphs above.

48.     Pursuant to 47 U.S.C. § 332(c)(7)(B)(iii), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

49.     The Board's decision violates Section 332(c)(7)(B)(iii) because it is not supported by substantial evidence in a written record.  The record does not contain substantial evidence to support the denial of the Application, and, in fact, does not identify any reason whatsoever why the Board ultimately denied the Application.

50.     The Board's decision has caused and will continue to cause AT&T irreparable harm.

12

51.     AT&T is entitled to relief under the Telecommunications Act ordering the Board to issue the special permit sought by AT&T in its Application, and all other permits and approvals required to install, operate and maintain the Facility.

.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, AT&T respectfully prays that the Court grant it relief as follows:

1.   Permit expedited review of the matters set forth in this Complaint;

2.   Enter an order declaring that the Board's decision violates and is preempted by 47 U.S.C. § 332(c)(7);

3.   Enter an order requiring the Board to issue AT&T the special permit requested in its Application and authorizing it to install its proposed Facility at the Site, and all other permits and approvals required to install, operate and maintain the Facility; and

4.   Order such other relief as the Court deems appropriate.

NEW CINGULAR WIRELESS PCS, LLC,

By its attorneys,

/s/ Wayne F. Dennison
Wayne F. Dennison, BBO No. 558879
wdennison@brownrudnick.com
Benjamin M. Welch, BBO No. 663456
bwelch@brownrudnick.com
Brown Rudnick LLP
One Financial Center
Boston, MA 02111
617-856-8200

September 10, 2010